UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

P&M SERVICES, INC.,

       Plaintiff,

v.                                                               Case number 07-12816

MARTIN GUBB,                                 Honorable Julian Abele Cook, Jr.

       Defendant.

ORDER

The parties to this litigation have been engaged in a series of lawsuits which involve an extremely competitive industry that, among other things, resizes damaged rolls of paper. At issue before the Court is a motion by the Defendant, Martin Gubb, who seeks to obtain a summary judgment against the Plaintiff, P&M Services, Inc. ("P&M Services") pursuant to Fed.R.Civ.P. 56. For the reasons that have been set forth below, Gubb's motion will be granted.

I.

P&M Services is a corporation which provides paper-sizing services to the printing industry. Mark Wallace is credited with having invented a "roll cutter" which cuts off the damaged ends of rolls of paper. In 1997, he filed a patent application with the U.S. Patent and Trademark Office ("Patent Office") for his "roll cutter" invention. Two years later, Wallace assigned all of his rights, as well as any "continuations, or divisions that may be filed with respect to the

1

Invention[,]" in the then-pending patent application to Norkol/Fibercore, Inc.[1] During the latter part of 1999, the Patent Office issued a "method" patent, U.S. Patent No. 5,964,024 ("'024 patent"), for the "role cutter" to Wallace. In 2001, he was granted an "apparatus" patent, U.S. Patent No. 6,282,766 ("'766 patent") which was subsequently assigned by him to Fibercore Equipment Co. (a registered assumed name of P&M Services).[2] In 2003, two corporations, Norkol/Fibercore, Inc. and Norkol/Fibercore Holdings, Inc. merged with P&M Services. As a result of this merger, the ownership in the '024 and the '766 patents are now claimed by P&M Services, including the patent rights to a roll cutting device known as the "Papersizer." [3]

Martin Gubb is the owner and sole shareholder of L&P Converters, Inc. ("L&P"), which is also in the business of salvaging rolls of paper by removing its damaged ends. He submits that between 1998 and1999, his company independently developed the "Precision Paper Saw" which utilized a method - similar to P&M Service's "Papersizer" - of removing the damaged end from

---

[1] It is the contention of Gubb that the assignment by Wallace occurred in 1997. To support his position on this issue, Gubb proffered a document which purports to be an assignment by Wallace in 1997. However, the Court is unable to conclusively evaluate the merit of this contention because of the extremely poor quality of this document. Notwithstanding, the assignment history of the '024 from the Patent Office clearly shows the effective assignment year to be 1999.

[2] The assignment of the '766 patent has been challenged by Gubb who contends that it "has never been assigned." In support of his argument, he points to a document that was obtained from the Patent Office's website, which purportedly states that the "assignment data [for '766 was] not available." Contrary to Gubb's contentions, the Court does not view this phrase as reflecting the absence of an assignment. Rather, the Court reads this phrase as constituting "assignment data [for '766 which was] not available." Notwithstanding, the '766 patent clearly lists Fibercore Equipment Co. as the "assignee" and Wallace as the "inventor."

[3] P&M Services correctly points out that "to the extent that there was no valid assignment to Fibercore Equipment Company, then Norkol/Fibercore, Inc. owned the '766 patent as a result of Wallace's assignment of the '024 patent application and all divisions thereof [which included the '766 patent]. [Therefore,] [a]ll of Norkol/Fibercore, Inc.'s interest in the '766 patent was subsequently transferred to P&M as a result of the 2003 merger."

of a roll of paper. [4] During its development of the "Precision Paper Saw," one of Gubb's employees, Andre Lavallee, was unable to resolve several operational problems, including, among other things, the speed and quality of the paper cuts. In April of 1998, he was instructed by Gubb to take a camera to the Northeast Graphics facility in Connecticut and observe P&M Service's "Papersizer" in operation. Subsequent to Lavallee's visit, another employee, Alex Infantino, testified in his deposition that Gubb had forwarded the photographs of the P&M Services "Papersizer" to him, along with a request to build a comparable machine. Thereafter, Lavallee signed a patent application, in which he identified himself as the inventor of the "Precision Paper Saw." However, this patent application, which was initially denied because of P&M Service's pre-existing '024 patent, was subsequently amended and filed with the Patent Office. Following its approval, the Patent Office issued Patent No. 6,405,623 ("'623 patent") to Lavallee who, in turn, assigned it to L&P. However, P&M Services claims that the amended application was fraudulent because it failed to disclose that the patented design had been taken from P&M's "Papersizer."

Subsequently, Gubb and his companies manufactured three machines that closely resembled P&M Service's "Papersizer." P&M Services contends that when Gubb and his companies sold one of the machines to a competitor, Quad/Graphics, and offered another machine for sale to others in the printing industry, he unlawfully infringed upon its patents.

Several law suits involving the parties followed. Beginning on January 18, 2001, Norkol/Fibercore, Inc., P&M Services' predecessor-in-interest, sued L&P and Gubb for their infringement of the '024 patent in the United States District Court for the Southern District of

---

[4]Gubb asserts that Sterling Technologies, Inc., another company owned by him, manufactured the "Precision Paper Saw."

Florida. However, this case was dismissed without prejudice on August 20, 2001 due to the absence of personal jurisdiction. On December 18, 2001, Norkol/Fibercore, Inc. filed another patent infringement suit in the United States District Court for the Eastern District of Wisconsin, seeking to hold Gubb and L&P liable for their alleged infringement of the '024 and '766 patents. However, the claims against Gubb were dismissed by the Court without prejudice on August 25, 2003 for lack of proper venue. However, the Wisconsin law suit proceeded against L&P and was stayed pending the completion of proceedings in the bankruptcy court.

On October 10, 2002, L&P initiated legal proceedings in the United States District Court for the Central District of California, alleging that Norkol/Fibercore, Inc. and P&M Services had infringed its '623 patent. L&P attempted to obtain a preliminary injunction which, if granted, would have prevented P&M Services from utilizing a certain paper-cutting method. The court, after determining that P&M Services - not L&P - was the inventor of the contested patent method, denied the request for injunctive relief. Gubb subsequently signed a covenant not to enforce the '623 patent. During the pendency of this litigation, L&P filed for bankruptcy, and after doing so, sought to voluntarily terminate the litigation, which was opposed by P&M Services. L&P then filed a motion to voluntarily dismiss the case, which was granted over the objections by P&M Services. The request by P&M Services for attorney's fees was denied and not appealed. In August 2004, L&P - citing financial difficulties - voluntarily dismissed this action with prejudice.

On July 1, 2004, Gubb sued P&M Services in this Court, seeking to obtain a declaratory judgment that the two "Papersizer" patents are unenforceable and invalid. P&M responded with a counterclaim, seeking to obtain damages for Gubb's alleged infringement of the "Papersizer" patents.

4

In the trial which followed, the jury determined that (1) the '024 patent was valid and enforceable, and (2) Gubb had personally induced its infringement. A final judgment, which permanently enjoined Gubb from infringing, or inducing the infringement of the '024 patent, was entered. The Court of Appeals for the Federal Circuit affirmed.

On July 7, 2007, P&M sued Gubb once again, maintaining that he had (1) violated the Sherman Act, (2) engaged in unfair competition and (3) attempted to monopolize the "Papersizer" market by fraudulently obtaining the '623 patent and engaging in abusive litigation. On May 27, 2008, Gubb filed a motion for summary judgment, which is now before the Court for its resolution. In his motion, Gubb asserts that P&M Services' antitrust and unfair competition claims are barred by (1) *res judicata* and (2) the applicable statute of limitations. He also submits that P&M Services cannot establish the essential elements of its antitrust or unfair competition claims.

II.

Under Michigan law, the doctrine of *res judicata* bars the litigation of a claim in any subsequent action if (1) the first case was decided on the merits, (2) the issues in the second case were resolved or could have been resolved in the first case, and (3) both actions involve the same parties or their privies. *Dart v. Dart*, 460 Mich. 573, 597 N.W.2d 82, 88 (1999). The doctrine of *res judicata* applies broadly and precludes the litigation of claims that are identical to those which have already been resolved, as well as those claims which "[arose] out of the same transaction which plaintiff could have brought, but did not." *Katt v. Dykhouse*, 983 F.2d 690, 693 (6th Cir. 1992).

In its complaint, P&M Services' asserts that Gubb violated the Sherman Act and engaged in unfair competition. In addition, P&M Services alleges that the '623 patent was fraudulently

5

obtained by Gubb, along with an intention to drive it out of business. In his motion, Gubb claims the previous lawsuit before this Court bars the current suit, contending that the first and third elements of *res judicata* have been met. He notes that the first lawsuit was decided on the merits, and involved the same parties as those in this action. Thus, the question before the Court is whether the claims in this case could have been asserted in the prior action.

P&M Services argues that its antitrust claim is not barred by *res judicata* because it was not a mandatory counterclaim in the prior litigation. Whether a Sherman Act antitrust claim is a compulsory counterclaim in a patent infringement action is a question of considerable debate. This Court is not aware of any decision by the Sixth Circuit Court of Appeals that is directly on point. On the other hand, it appears that there is a split among some of the other circuits on this issue.

In order to understand the law in this area, the Court finds that will be necessary to examine four cases; namely, (1) *Mercoid Corp. v. Mid-Continent Inv. Co.,* 320 U.S. 661 (1944); (2) *Hydranautics v. Film Tec Corp.,* 70 F.3d 533, 536-37 (9th Cir. 1995); (3) *Tank Insulation International, Inc. v. Insultherm, Inc.,* 104 F.3d 83, 88 n.5 (5th Cir. 1997), *cert. denied* 522 U.S. 907 (1997); and (4) *Critical-Vac Filtration Corp. v. Minuteman Int'l Inc.*, 233 F.3d 697, 702 n.5 (2nd Cir. 2000).

In *Mercoid Corp.,* the Supreme Court allowed the defendant (Mercoid Corporation) in a patent infringement lawsuit to assert an antitrust counterclaim that it had failed to raise in an earlier patent infringement lawsuit that had been brought by the same plaintiff, Mid-Continent Investment Corporation. The Supreme Court treated Mercoid's counterclaim as permissive, citing Federal Rule of Civil Procedure 13(b), rather than as compulsory under Rule 13(a). Concluding that the previous lawsuit had resolved different "matters in issue or points controverted" than those involved in the

6

dispute before it, the Court held that principles of *res judicata* did not bar Mercoid's antitrust counterclaim for damages. *Mercoid*, 320 US at 671.

In *Hydranautics v. Film Tec Corp.,* the Ninth Circuit Court of Appeals applied the rationale in *Mercoid* to reach a decision that an antitrust claim is not a compulsory counterclaim in a prior patent infringement suit. The court held that it was permissible for Hydranautics to delay its lawsuit against FilmTec for predatory patent activity until it had succeeded in defeating the infringement case. The Ninth Circuit provided the following reasoning:

> In many cases even if the antitrust counterclaim were asserted by counterclaim, the court would sever the issues and resolve the infringement case first. The evidence for patent infringement and antitrust damages may differ considerably, depending on the particulars of the case. . . . The distinctiveness between the facts giving rise to the patent and those giving rise to the antitrust claims is suggested by the different appellate paths Congress has provided for those two kinds of claims. Appeals from patent infringement decisions now go to the Federal Circuit, but appeals from antitrust decisions go to the regional circuit in which the district court sits.
> . . . .
> The antitrust claim attacks the patent infringement lawsuit itself as the wrong which furnishes the basis for antitrust damages. This is somewhat analogous to a civil claim for malicious prosecution. It is usually held that a malicious prosecution claim cannot be asserted as a counterclaim to the original suit which furnishes its predicate. (citation omitted.) *Mercoid* is consistent with this approach, and we see no reason to distinguish *Mercoid* from the case at bar.

*Hydranautics*, 70 F.3d at 536-7.

In *Tank Insulation International, Inc. v. Insultherm, Inc,* the Fifth Circuit Court of Appeals came to the same conclusion in 1997 as the *Mercoid* and *Hydranautics* courts. Like the two previously discussed cases, the *Tank Insulation* court considered whether an antitrust claim is a compulsory counterclaim in a patent infringement action, and it held that it is not. The Fifth Circuit cited to both *Mercoid* and *Hydranautics*, and found that an antitrust claim is not a mandatory

7

counterclaim to a patent infringement lawsuit.

However, in its 2000 decision in *Critical-Vac Filtration Corp. v. Minuteman Int'l Inc.*, the Second Circuit Court of Appeals rejected the *Mercoid* decision after noting that it had been criticized for years.[5] The *Critical-Vac* court made a distinction between antitrust claims involving patent misuse versus those based on patent validity. In the case of the former, where an antitrust claim alleges that a defendant misused a patent (as the Second Circuit believes was the case in *Mercoid*), the antitrust claim is not barred by the previous patent infringement suit. However, where the antitrust claim alleges that the defendant procured a completely invalid patent in order to thwart the plaintiff's business, as was the allegation in *Critical-Vac*, subsequent antitrust litigation is barred by the previous infringement action. The Court stated:

> The distinction between patent misuse and patent invalidity claims thus provides an appropriate rationale for *Mercoid*'s exception to Rule 13(a), and an adequate explanation of the reason why that exception does not apply to C[ritical]-Vac's claims. In the absence of further guidance in *Mercoid*, we regard the patent misuse/patent validity distinction as a practical and useful way of distinguish between *Mercoid* and the case at bar, and hold that the *Mercoid* exception to Rule 13(a) does not apply to antitrust claims that raise the issue of patent validity and are, therefore, logically connected to the issue of patent infringement.

*Critical-Vac*, 233 F.3d at 704.

---

[5]The Second Circuit provides the following list of cases which criticize *Mercoid:*

See *United States v. Eastport Steamship Corp.*, 255 F.2d 795, 805 (2d Cir. 1958) (limiting *Mercoid* to its facts); *see also Burlington Indus. Inc. v. Milliken & Co.*, 690 F.2d 380, 389 (4th Cir. 1982) (*Mercoid's* "continuing validity is open to serious question"); *Longwood Mfg. Corp. v. Wheelabrator Clean Water Sys.*, 954 F.Supp. 17, 18 (D.Me. 1997) (*Mercoid* has been "roundly criticized"); *USM Corp. v. SPS Tech., Inc.,* 102 F.R.D. 167, 169-70 (N.D.Ill. 1984) ("overwhelmingly criticized"); *Lewis Mfg. Co. v. Chisholm-Ryder Co.*, 82 F.R.D. 745, 750 (W.D. Pa. 1979) ("criticized in detail").
*Critical Vac,* 233 F.3d at n.6.

In its examination of this issue, the Court has not uncovered any reported case by the Sixth Circuit which makes any reference to the over fifty-year old Supreme Court decision in *Mercoid*. Without any specific guidance from the Sixth Circuit which suggests an invalidation of *Mercoid*, the Court must accept the ruling of *Mercoid,* and find that the antitrust claim by P&M Services is not barred by the previous patent infringement lawsuit.

## III.

Antitrust claims under the Sherman Act are governed by 15 U.S.C. § 15(b) which succinctly states that "(a)ny action to enforce any cause under [the Sherman Act] shall be forever barred unless commenced within four years after the cause of action accrued." Under this section, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971). The "act" complained of in this case is the alleged sham patent lawsuit that was filed by Gubb in 2002.

Thus, the Court must now seek to determine when P&M Services' cause of action "accrued." P&M Services maintains that the four-year statute of limitations does not run from the commencement of the patent infringement lawsuit, but from its termination. According to this argument, P&M Service's lawsuit was timely filed, as it was commenced within four years after the termination of the California lawsuit. However, Gubb takes a different posture, asserting that the statute of limitations begins to run from the initiation of the alleged sham lawsuit. Here, the record indicates that the California litigation was filed in 2002, and the current lawsuit was not filed until 2007. Thus, it is time-barred.

In general, the operative overt act for purposes of the antitrust limitations statute is the filing

9

of the sham lawsuit. *In re Relafen Antitrust Litig.*, 286 F. Supp. 2d 56, 61 (D. Mass. 2003). See also *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1274-75 (5th Cir. 1991); *Korody-Colyer Corp. v. General Motors Corp.*, 828 F.2d 1572, 1578-79 (Fed. Cir. 1987); *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 239 (9th Cir. 1987); *Lender's Service, Inc. v. Dayton Bar Ass'n*, 758 F. Supp. 429, 442-43 (S.D. Ohio 1991).

The statute of limitations under the Sherman Act tolls - or is paused - in two situations. First, a "plaintiff may recover damages occurring within the period of the statute of limitations that are the result of conduct occurring prior to that period, if at the time of the conduct, those damages were speculative, uncertain or otherwise incapable of proof." *Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230, 233-234 (6th Cir. 1974), *citing Zenith Radio Corp.,* 401 U.S. at 338-42 (1971). Second, "in cases in which the plaintiff has refrained from commencing suit during the period of limitation because of inducement by the defendant. . . . or because of fraudulent concealment." *Akron Presform Mold Co.,* 496 F.2d at 233-24, *citing Glus v. Brooklyn Eastern Terminal*, 359 U.S. 231 (1959). In addition, the Sixth Circuit stated in *Akron Presform* that "the party seeking the benefit of [tolling] has the burden of proof to establish them. All presumptions are against him, since his claim is against the current of the law and is founded on exceptions." *Akron Presform Mold Co.*, 496 F.2d at 233.

However, this continuing violation exception is not applicable in the instant case. Significantly, P&M Services has neither raised it nor argued that it applies here. The cases involving "continuing violations" generally have directed their attention to those defendants who have repeatedly invaded the plaintiffs' interests. *See, e.g., DXS, Inc. v. Siemens Med. Sys. Inc.,* 100 F.3d 462, 467 (6th Cir. 1996). Here, the "act" which is the focus of the parties' arguments is

the filing of this lawsuit. For example, P&M Services does not assert that Gubb or L&P were engaged in a series of discrete acts of predatory pricing. *In re Relafen Antitrust Litigation*, 286 F.Supp.2d 56, 62 (D. Mass. 2003). In a case involving a plaintiff competitor who sued a defendant for filing a sham suit, the Ninth Circuit stated that:

> the reasonable expectation from the commencement of a lawsuit is that the plaintiff will pursue the litigation until it prevails or the last appeal is exhausted. . . . Any injury to [the plaintiff] resulting from continued prosecution through the normal course of the appellate process relates back to the initial decision to file.

*Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238-239 (9th Cir. 1987). The continuation of a sham litigation does not constitute a continuing violation of antitrust laws.

P&M Services does not make any argument that the speculative damages exception applies here. Where damages flowing from conduct which violate the antitrust laws are uncertain at the time that the defendant engages in the challenged conduct, the cause of action for future damages accrues on the date when they are suffered. *Zenith Radio Corp.*, 401 U.S. at 339. This exception does not apply here. At the time of the filing of the California lawsuit in 2002, P&M Services had already (1) engaged in litigation with Gubb and L&P, and (2) asserted that the '623 patent was invalid. There are no facts that came to light at a later date which revealed the alleged "sham" nature of the litigation. As a result, P&M Services is not entitled to this exception to the statute of limitations.

P&M Services does not argue that either of these exceptions apply to the case at hand. Instead it maintains that the holding by the Ninth Circuit in *Hydranautics, supra*, supports its contention that the statute of limitations should run from the conclusion of the lawsuit. This argument is not persuasive, inasmuch as *Hydranautics* did not deal with - much less mention - the

11

statute of limitations. Thus, this Court declines to interpret the rationale behind the holding by the Ninth Circuit to mean more than is directly stated in that opinion.

Next, P&M Services argues that the statute of limitations should be calculated from the filing date of the first Michigan lawsuit - not the California lawsuit. It contends that the Michigan case involved abusive litigation issues relating to violations of the Sherman Act. A review of P&M Service's pleadings reveals that there is no specific mention of the Michigan lawsuit which was tried and hotly contested. With this background, P&M Services cannot establish that the lawsuit was "completely baseless." In general, a plaintiff cannot sustain a claim for an antitrust violation based on "mere attempts to influence the . . . enforcement of laws." *Eastern Railroad Presidents Conference v. Noerr Motor Frieght, Inc.*, 365 U.S. 127 (1961).

In order to bring a lawsuit for an antitrust violation based on a previous lawsuit, a plaintiff must establish that the litigation was a "sham." To do so, the aggrieved plaintiff must demonstrate that the litigation was "objectively baseless," in that "no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60 (1993).

In the case at hand, Gubb's lawsuit in Michigan sought to obtain a declaratory judgment that the P&M Services' patents were invalid and unenforceable. The case proceeded to trial, and it is impossible to say that Gubb could not have realistically expected to achieve success on the merits. The jury ultimately returned a verdict that one of the P&M Services' patents was valid and enforceable and had been infringed by Gubb. However, a different verdict would have been plausible, as well. Thus, P&M Services cannot sustain an antitrust suit on the basis of the Michigan litigation.

IV.

Under Michigan law, an unfair competition claim begins to accrue "at the time the wrong upon which the claim is based was done regardless of the time when damage results." Mich. Comp. Laws §600.5827. As explained above, the "wrong" in this case is the filing of the California infringement lawsuit. Again, without legal authority, P&M Services argues that (1) this Court should calculate the running of the statute of limitations from the date on which the litigation concluded - not the date on which it was filed, and (2) its unfair competition claim is based not only on the California litigation, but also on the earlier Michigan lawsuit. Even if the Court accepts, arguendo, that the Michigan litigation can be the basis of an unfair competition claim, the record indicates that it was filed on July 1, 2004 - almost exactly three years before the current litigation was filed on July 7, 2007. Thus, P&M Services' claim for unfair competition - based on the California or the Michigan litigation - is barred by the three year statute of limitations.

V.

In addition to its other requests for a dismissal on the *res judicata* and the statute of limitations theories, Gubb also asks for the entry of a summary judgment under Federal Rule of Civil Procedure 56(c), arguing that P&M Services has not established the requisite elements for an antitrust and unfair competition claim.

In order to maintain an action under Section 2 of the Sherman Act, a plaintiff must establish that the defendant has possession of monopoly power in the relevant market. *U.S. v. Grinnell Corp. et al.*, 384 U.S. 563, 570 (1966). Gubb contends that he was not in competition with P&M Services in the relevant market. Notwithstanding, P&M Services argues that a ruling on this issue is premature, pointing out that (1) no discovery has been conducted as of this date, and (2) Gubb has

not submitted affidavits or deposition transcripts upon which to base his arguments. The Court agrees, and finds that addressing this issue is premature and unnecessary as it finds that the claims by P&M Services against Gubb relating to the issues involving alleged violations of the Sherman Act and his acts of unfair competition are both barred by the applicable statute of limitations.

Accordingly, the Court must, and does, grant Gubb's motion for summary judgment, and orders the dismissal of both of P&M Services' claims against him.

IT IS SO ORDERED.


Dated: September 8, 2008         s/ Julian Abele Cook, Jr.
       Detroit, Michigan         JULIAN ABELE COOK, JR.
                                 United States District Court Judge


Certificate of Service

I hereby certify that on September 8, 2007, I electronically filed the foregoing with the Clerk of the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

                                 s/ Kay Alford
                                 Courtroom Deputy Clerk